OTTAVIO D'AMATO ET AL. *v.* SYLVIA DONATONI ET AL.

May Term, 1933.

Present: POWERS, C. J., SLACK, MOULTON, THOMPSON, and GRAHAM, JJ.

Opinion filed October 3, 1933.

*Theriault & Hunt* for the plaintiffs.

*C. O. Granai* for the defendants.

GRAHAM, J. Cornelius O. Granai, an attorney at law, of the city of Barre, on November 18, 1929, collected from the United States Government the sum of $5,921.30, the amount of a war risk insurance policy upon the life of Zeno Pellegrini, deceased, and payable to Zeno's estate. At the time of his death, Zeno's heirs were his father and mother, Nicola and Maria Pellegrini, residents of Italy. Both deceased prior to 1929. Nicola survived Maria, leaving as his heirs at law Joseph Pellegrini of Barre, and the defendants Sylvia Donatoni and Caterina Zorzi, both of San Ambrogio, Italy, all children of his deceased brother.

Sometime in 1929, or before, Joseph, who had corresponded with Sylvia and Caterina respecting the claim, consulted Granai and, purporting to act for himself and his two sisters, represented that he had spent considerable time and money in unsuccessful attempts to collect the insurance, and agreed with Granai that, if he could and would collect the money, they would pay him one-fourth of the amount collected after the settlement of Zeno's estate. Joseph, however, was not acting as the agent of his sisters, or either of them, in making the agreement with Granai. Thereafter, Granai procured the appointment of himself as administrator of Zeno's estate and made the collection through extensive correspondence with, and proofs submitted to, the War Risk Insurance Board in Washington, but without litigation.

On April 11, 1930, Granai sent a letter, written in the Italian language, to each of the sisters in which he enclosed $1,000, or 19,047 lira, Italian money, as their respective shares in Zeno's estate. Releases (Defendants' Exhibit D and E), such as are commonly used in probate practice, were enclosed with these letters, and they were signed by Sylvia and Caterina, and later returned to Granai. Granai then filed in probate court his final administration account, which was allowed, and distribution was ordered on December 18, 1931, decreeing the residue of $5,331.63 to Nicola and Maria in equal shares. Granai then discovered, through directions of the probate court, that it was necessary to administer the estates of Maria and Nicola, and he was appointed administrator of those estates. Maria's estate was finally settled on March 7, 1932, and the residue of $2,533, was decreed to Nicola. Nicola's estate was finally settled on the same date and the residue amounting to $4,810.26 was decreed

to Joseph, Sylvia, and Caterina. The only assets of these estates were the respective interests in the insurance policy on the life of Zeno. On March 23, 1932, Granai again wrote to Sylvia and Caterina, in the Italian language, purporting to explain his connection with the claim against the government, and the distribution of the proceeds. A statement, not a copy of his administration account filed in probate court, but showing the payment to himself and the distribution by him to Joseph, was enclosed; also enclosed with these letters were two releases (Defendants' Exhibits A and C), one of each of the sisters, to be signed by them in full discharge of Granai as administrator of Nicola's estate. The sisters signed the respective releases, and returned them to Granai.

On September 30, 1930, Sylvia and Caterina, by special power of attorney, appointed the plaintiff, D'Amato, the Royal Italian Consular Agent at Portland, Maine, in their name, account, and interest to "represent them before competent American authority to collect the share due them" from the insurance issued to Zeno; and for them "to appear before whatever authority, board or public office charged with the liquidation and payment of the aforesaid sum; conferring all formalities necessary and required to obtain said payment; to present, upon request, the nature of (their) rights as heirs; to sign documents necessarily required; to verify the exactness of the liquidated sums with the sum due because of the death aforesaid; to withdraw said money and to execute releases therefor from all liability to the office paying the same; doing in fact, all that which (they) could or would do if personally present, ratifying herein whatever shall be done by said attorney in conformity herewith and with law."

Early in 1931, Granai was informed of the power of attorney and announced his willingness to recognize D'Amato and the plaintiff Bove, a Portland attorney, as agents of Sylvia and Caterina, having full authority in the matter. Thereafter, and before Granai procured the last releases, the matter came into the hands of plaintiffs, Theriault & Hunt, as attorneys, from Attorney Bove, and Granai was so advised.

This action is brought to recover for the services and expenses of the plaintiffs in prosecuting defendants' claims in the Pellegrini estates before the probate court, and Granai is sum-

moned as trustee. Judgment was entered as against the defendants, Sylvia and Caterina, and a hearing was had before the court on the liability of the trustee. Findings of fact were filed, and there was a judgment thereon discharging the trustee. The case as against the trustee is for review on plaintiffs' exceptions.

The releases, Defendants' Exhibits A and C, were offered in evidence by the trustee as a full discharge of himself as administrator for the respective distributive shares of the defendants, and they were received, subject to the objection and exception of the plaintiffs that, in view of the power of attorney still in force, a discharge or release by the person who gave the power of attorney has no bearing or materiality.

The argument is made before us that the power of attorney was irrevocable so far as affects the right of the plaintiffs to charge their services and expenses in the execution of the power against the moneys of the defendants in the hands of the administrator.

■■ It is a general rule of law that a principal may revoke a mere naked authority at any time. A revocation of the agents authority is subject to the will and even caprice of the principal. 21 R. C. L. 887. There is, however, a well-recognized exception to this general rule to the effect that where an authority or power is coupled with an interest, or where it is given for a valuable consideration, or where it is part of a security, unless there is an express stipulation that it shall be revocable, it is, from its very nature and character, in contemplation of the law, irrevocable. Note 7 A. L. R. 947. To constitute a power coupled with an interest, the person clothed with it, must derive, under the instrument creating it, or. otherwise, a present or future interest in the subject itself,· on which the power is to be exercised, and not merely in that which is produced by the exercise of the power. *Mansfield* v. *Mansfield*, 6 Conn. 559, 16 A. D. 76; *Hunt* v. *Rousmanier*, 8 Wheat. 174, 204, 5 L. ed. 589; *Hartley and Minor's Appeal*, 53 Pa. St. 212, 91 A. D. 207; *Gilbert* v. *Holmes*, 64 Ill. 548; *Taylor* v. *Burns*, 203 U. S. 120, 51 L. ed. 116, 27 Sup. Ct. 40; Annotation, 65 A. L. R. 380. In *Hunt* v. *Rousmanier, supra* (a leading case on the subject), Chief Justice Marshall said: " 'A power coupled with an interest,' is a power which accompanies, or is connected with, an interest. The power and the interest are united in the same person. But if we

are to understand, by the word 'interest,' an interest in that which is to be produced by the exercise of the power, then they are never united. The power, to produce the interest, must be exercised, and by its exercise is extinguished. The power ceases when the interest commences, and therefore cannot, in accurate law language, be said to be 'coupled' with it."

The clear distinction between *revocable* and *irrevocable* powers is recognized in our own cases. *Michigan Insurance Company* v. *Leavenworth*, 30 Vt. 11, 23; *Tilden* v. *Brown*, 14 Vt. 164, 170; *Wells* v. *Foss*, 81 Vt. 15, 69 Atl. 155.

██ ██ A power of attorney to collect debts and to settle claims is not a power coupled with an interest, and is revocable; and the same result obtains where, by the terms of the instrument creating the power, the agent is to receive as compensation a share of the proceeds. *Hartley and Minor's Appeal, supra; Gilbert* v. *Holmes, supra;* Annotation, 64 A. L. R. 380, 386. If the principal disposes of the subject-matter of the agency, this, by implication of law, will operate as a revocation of the power of the agent. *Bissell* v. *Terry*, 69 Ill. 184; *Gilbert* v. *Holmes, supra; Brookshire* v. *Brookshire*, 30 N. C. 74, 47 A. D. 341; *Flanagan* v. *Brown*, 70 Cal. 254, 11 Pac. 706.

██ ██ The power of attorney from the defendants to plaintiff D'Amato conferred a simple or naked authority in him to collect for them their shares or interests in the insurance issued upon the life of Zeno. No assignment of those interests was made, nor was any lien created thereon in favor of the agent. The power of the plaintiffs to act in the matter was revocable at the defendants' pleasure, and it would be revoked, as matter of law, by the execution by them of valid releases to the administrator. The admission of the releases in evidence was without error.

The trial court found that during the time the estates were in process of settlement "the defendants were occupying the house in San Ambrogio owned by Joseph" for which Joseph made no charge, and that "in consideration of that fact the defendants, by correspondence with Joseph, had agreed with him that Joseph should receive the additional amount which he did receive from the estate"; that the releases (Defendants' Exhibits A and C), were signed by the defendants in recognition of that

arrangement. The plaintiffs excepted to these findings as being unsupported and unwarranted by the evidence.

■ It is sufficient to say that these findings are in exact accord with the testimony of Joseph. The arguments made in the plaintiffs' brief, pointing out certain claimed weaknesses in Joseph's testimony, and making reference to claimed countervailing evidence, would be pertinent before the trial court, but, on review, the findings must stand if supported by any substantial evidence, although there may be inconsistencies, or even substantial evidence to the contrary. *Patch* v. *Squires,* 105 Vt. 405, 165 Atl. 919, 921. These challenged findings, being thus supported, must stand.

■■ Serious argument, concerning the probity of Granai, as a lawyer and as administrator of the estates, is made respecting the findings that "the defendants signed the releases, Defts.' A and C, respectively, in recognition of the arrangement between Joseph and Granai, and that the defendants did then intend to accept the sum of $1,000 each in satisfaction of their distributive shares." The exceptions to these findings are grounded upon the claim that the finding of such an intent is unwarranted by the evidence, because the signing of the releases was induced by fraudulent statements, suppressions, and coercions of Granai; and that the agreement between Joseph and Granai was champertous and void.

Assuming, but not deciding (the point is not made in the record), that the plaintiffs are proper parties to attack the releases on those grounds (the defendants apparently treat them as valid and binding upon them), we will consider the merits of the questions presented.

The court based its findings and conclusion upon the releases, A and C, and so we come directly to what took place when those papers were signed. It is unnecessary, and would greatly extend this opinion, to review in detail the findings relating to the correspondence which passed between Granai and the defendants at the time the first releases, Defendants' Exhibits D and E, were signed, or the correspondence between Granai and Attorney Bove in relation thereto. We pass directly to the precise point of the exceptions. In view of its importance, Granai's letter to each of the defendants, dated March 23, 1932, should be quoted in full. He wrote:

"I have today closed the matter of the estate of Zeno Pellegrini and herewith enclosed I present the proportions in which the money is to be distributed. At the moment of closing the estate, Mr. Theriault, an attorney of Montpelier, Vermont, was present and represented Mr. Bove of Portland, Maine. He claimed to represent you as an heir of the estate of Zeno Pellegrini. Before this, your brother had received two letters from you in which you stated you did not care to have an attorney represent you. The enclosed explains the matter completely. When I wrote you and sent you a release in the estate of Zeno Pellegrini I sent it with the thought that you knew exactly what was in the estate. Permit me to say here, the entire story regarding the matter.

"Your brother came to my office during 1928. At that time he told me he had an estate which he liked to finally adjust but that he could no longer put any money in the matter because of the fact that he had already put in something more than $500 and if I wanted to work in this case, he would concede a share with the heirs, that is a fourth of the money in question. After much hesitation I finally consented to take the matter under the above express conditions. I was obliged to do much preparatory work and after much labor was successful in obtaining a check from the Government. Perhaps you will remember that there was one certain Galvani who believed he had a will and entitled to all the money. For sometime we feared he would obtain the money, but as already stated, because of the work which we did, the Government granted it to us. Much work was done by your brother as well as by me to obtain this money. The disposition as made is in proportion to the work done.

"After I sent you your share of the inheritance, and as to that we were discharged, I believe the Court would grant permission to close the mat-

ter by settling the account of Zeno Pellegrini; but the Court refused, under the laws of succession in this State I was obliged to go to Court to settle the estate of Mary and Nicola Pellegrini. The reason this had to be adjusted was because of the death of the son before the mother and lastly the father. Each estate succeeded the other.

"You will find enclosed a detailed account of the money expended in closing the three estates. I have purposely made each account in Italian in order to obviate any misunderstanding regarding the settlement of these estates. I am the administrator of all three estates and as such I submit my account for your consideration. It is my desire that you examine this account with attention in order that you may understand exactly what has transpired. You will also find enclosed two releases which I hope you will sign and return at once so I can notify the Court of the acceptance of your share. I have had these releases prepared in Italian language so as to avoid any possible misunderstanding.'

"The attorney at Portland, Maine, may write you making many promises and telling you how much more he can do for you than we have done. The attorney expense in this case has already been sufficiently large and if this litigation continues, I frankly say to you I cannot tell what will remain if this matter goes through Court.

"I have discussed the case with your brother with regard to the balance; whether he had any instructions regarding this from you or your sister, and he informed me he had none, therefore the balance, which you will note in the account amounts to a nominal sum, will go to you.

"I am certain you will approve the manner of our conduct of this case and that you will promptly realize under any circumstances, including the possibility of your bother as well as me not obtaining any compensation in money from the estate,

that the distribution as made is not out of proportion. I have deducted the sum of money agreed upon by the heirs for my services. I would never have taken the case under any other circumstances in consequence of the possibilities of having to invest my own money without any reimbursement for my expenditures. Under these circumstances I procured the money for the estate.

"Attorneys are an expensive proposition and litigation between the heirs to procure this money cannot be advantageous to anyone. When the Court issues its decree in this case, I will send you a copy of the Court's action in order that you may see what the Court has decided in the matter.

"The enclosed account is a record of my account and of the distribution which was made between you and your brother on the date indicated therein. I am confident this explains the situation and that you would do whatever your brother has done to avoid litigation. Please return the enclosed releases at the earliest moment and if there is anything else you desire to know, ask and I shall reply in such manner that you will be fully satisfied.

Sincerely yours,

COG/M C. O. GRANAI.

"P. S. There may be more money than appears in this account. I cannot tell you now precisely what that is at the moment but believe it will be at least double if not more than the amount shown in this account."

In each letter Granai enclosed a release to be signed (Exhibits A and C, respectively), and an itemized account purporting to show how he had handled the money. It did show the amount received from the government, $5,921.30; the amount allowed Joseph by the commissioners, $468; the amount paid Joseph as his share, $1,766.02; the amount paid Sylvia and Caterina as their shares, $1,000 each; and the amount received by himself for collecting the insurance and his services as ad-

ministrator, $1,202.54, which included an allowance of $225 by the probate court for his services as administrator of the three estates. The account also showed a balance of $53.12, with bills amounting to $5 to be paid. The letters of March 23, 1932, were written by Granai as administrator, and, so far as appears from the findings, contained the only information from him to the defendants of the manner of his settlement of the estates in the probate court. The defendants were not informed by him of the amount of his allowance by the probate court.

It is quite true that Granai, as administrator of the estates, was a technical trustee, *Hall* v. *Windsor Sav. Bk.*, 97 Vt. 125, 145, 121 Atl. 582, and as such was held to the utmost frankness and fair dealing with the defendants as beneficiaries. *In re Walker's Estate*, 100 Vt. 366, 370, 137 Atl. 321. But Granai was acting in making the collection as a lawyer as well as administrator—for Joseph alone, to be sure—and that this was fully understood by the defendants is evidenced by their reference to him as such in one of their letters to D'Amato. The administration of the estates in probate court was, in the circumstances, a required procedure for receiving and disbursing the insurance money, but those proceedings did not nullify or prevent any valid agreement between the heirs and the attorney, for his compensation, and for the division of the residue among themselves. The question before us does not require a discussion of whether Granai might have given more detailed information than his letter contains, or might have expressed what he did give in clearer and more accurate language. The point is whether what he did say or did not say constitutes such a fraud upon the defendants as will prevent the releases which they signed from furnishing support for the challenged findings and conclusion of the trial court. Granai, when he wrote his letter of April 11, 1930, understood, so he says, that his agreement with Joseph had been communicated to the sisters, and he had the right to assume that material details occurring after September 30, 1930, had been communicated to them by their agent and attorneys. The material facts were the allowance to Joseph, the payment to Granai, and the arrangement under which those payments were made. Those facts were clearly stated, and were understood by the defendants. Under those circumstances, the acceptance of the payment made as their respective shares,

and the execution by them of the releases, fully justifies the finding and conclusion of a ratification of the arrangement between Joseph and Granai. There is no such public interest involved, as appeared in *Jenness* v. *Simpson*, 84 Vt. 127, 78 Atl. 886, and discussed in *Grapes* v. *Rocque*, 97 Vt. 531, 534, 124 Atl. 596, as will prevent, as matter of law, the allowance of a ratification.

By what we have said, we do not intend to imply that it would not have been more lawyer-like and ethical for Granai to have dealt through the agent and attorneys, but he had the legal right, if he chose, to deal directly with the principals. We are concerned now with legal rights, and not ethical principles.

██ It remains to inquire whether the agreement between Granai and Joseph was champertous. Champerty is an agreement between the owner of a claim and a volunteer that the latter may take the claim and collect it, dividing the proceeds with the owner, if they prevail—the champertor to carry on the suit at his own expense. *Hamilton* v. *Gray*, 67 Vt. 233, 235, 31 Atl. 315, 48 A. S. R. 811.

 It is an essential element of a champertous contract that a suit must be in contemplation, and that the attorney is to prosecute the suit at his own expense. *Hamilton* v. *Gray*, *supra; In re Aldrich*, 86 Vt. 531, 534, 86 Atl. 801. Contracts by which an attorney's compensation is made contingent upon his success, and made payable out of the proceeds recovered, although frequently condemned, have now become so common that they are quite uniformly held legal and are constantly enforced. *In re Aldrich*, *supra;* 5 R. C. L. 276; 11 C. J. 243; Note, 100 A. S. R. 577.

██ Granai testified that he took the case on a contingent fee, that if the money was recovered he was to get one-fourth. Standing thus, the arrangement was not champertous. As we have seen, no suit was instituted. The findings do not show that one was contemplated. Granai makes reference, in his letter above quoted, to the possibility of his having to invest his own money without reimbursement for expenses, which, he says, was a circumstance affecting his compensation. But since the trial court declined, upon request of the plaintiffs, to draw the incriminatory inference, we would not be justified in doing so, as matter of law.

We have considered all questions which have been sufficiently briefed to require attention, and we find no error.

*Judgment affirmed.*